## PAUL G. GLEISES v. McHATTON—Same v. ROMAGOSA.

Where it appeared that a sale was made for cash but it is shown that no money was paid, and it was
understood between the parties that the property was conveyed in trust to the apparent vendee, he
assuming to pay the debts due on the property, and it was agreed that when these debts were paid
the property was to be reconveyed. *Held:* that such a sale was a mere simulation, and that credi-
tors of the vendor seizing such property under execution, have a right to maintain the seizures by
showing the simulation.

*Held,* also, that where there is a delivery of the property under such a contract, it is a contract of
pledge, and the party in whose favor it is made, has no right to enjoin the sale of the property un-
der execution, but should proceed by way of third opposition to claim a priority of privilege upon
the proceeds of the sale.

APPEAL from the Fourth District Court of New Orleans, *Price,* J.
*Durant & Horner,* for plaintiff and appellant. *Mott & Fraser* and *C. Rose-
lius,* for defendants.

BUCHANAN, J. The sale of the 17th October, 1857, under which plaintiff
claims, appears to be a simulation, as decided by the District Judge.

It professes to have been made for the consideration or price of $18,500 cash
in hand, paid by the purchaser to the seller.

Now, it is proved and admitted that no money whatever was paid.

An obligation with a false cause or consideration can have no effect. C. C.
1887.

But Article 1894 says, that if the cause or consideration expressed in the con-
tract does not exist, yet the contract is good, if the party can show the existence
of a true and sufficient consideration.

What is the consideration that the party has shown in this instance?

The assumption of a debt to *Alexander Bonneval,* secured by mortgage on the
property mentioned in the sale under consideration, and other property, to-wit: a

tract of land on the Bayou St. John, in this parish. To warrant him against the consequences of this assumption, plaintiff ostensibly became the purchaser at Sheriff's sale of the land on the Bayou St. John, seized under *Bonneval's* mortgage which had been assigned to plaintiff for a nominal sum of eight thousand dollars; and at private sale of the Mississippi land and slaves, the sale now under consideration for a nominal price of $18,500, the total amount of the *Bonneval* debt, as stated by plaintiff, including interest, costs, lawyer's fees, &c., was $17,436 93.

The evidence shows that all this property was thus conveyed in trust for the payment of the indebtedness of *Ducayet* thus assigned, and with the understanding that it was to be reconveyed when the debt should be extinguished.

The contract was therefore under the consideration proven not a sale, but (granting that it was followed by delivery,) a pledge.

It was a simulated sale, that is to say, it had the appearance, but not the reality of a sale. And the defendants, as was said in *Erwin* v. *The Bank of Kentucky*, 5 An. p. 4, have a clear right to maintain their seizure, by showing that simulation. Considered as a pledge of the property, the plaintiff had no right to enjoin its sale under the executions of the defendants. He should, in strictness, have proceeded by way of third opposition, to claim a priority upon its proceeds. But it is not necessary to put the plaintiff out of court upon this technical ground, for we have evidence in the record that enables us to dispose of his claim, considered as a third opposition of a pledgee. The evidence shows that the liabilities, to secure which the pledge was given, have been extinguished, or at least that they ought to be, funds having been realised from sales of the pledged property, made by plaintiff, sufficient in amount to cover, and more than cover those liabilities.

1. Plaintiff sold to *James Arthur Blanc*, on the 27th January, 1858,
   a portion of the Bayou St. John property, for . . . . . . . . . . $8,461 25
2. He sold to *J. L. Tissot*, on the 29th April, 1858, the remainder
   of the said property, for . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,000 00
3. He sold to *Charles M. Simpson*, on the 6th February, 1858, the
   tract of land in Jackson Co. Miss., (Pascagoula,) for . . . . . 11,000 00

            Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25,461 25
The *Bonneval* debt, assigned to plaintiff, we have seen, was . . . . . . 17,436 93

Excess, after satisfying plaintiff, . . . . . . . . . . . . . . . . . . . . . . . . . . $8,024 32

It is said by the witness *Simms*, that plaintiff had endorsed for *Ducayet*, to the extent of $8000. It is not shown that plaintiff has paid any of those endorsements; on the contrary, it is proved by *Hepp*, that he refused to pay one of them, $4000, on the plea of usury. But even had plaintiff paid those endorsements, they were no part of the consideration of this sale or pledge, and consequently confer no privilege upon the pledged property. Indeed, the amount of that pledge could not, legally, exceed the amount mentioned in the Act, viz: $18,500. Lastly, supposing the endorsements paid, and they were covered by the pledge, plaintiff has sold for enough to reimburse himself in full. Plaintiff is therefore without any claim, either legal or equitable, upon the six slaves seized under the executions of the defendants.

As to the possession of plaintiff under the bond, said to have been given in Mississippi for the forthcoming of some slaves, it is irrelevant to this case. In the first place, neither in his petition against *McHatton*, nor in that against *Romu-*

71

*gosa,* does plaintiff set up title to the slaves seized, under his forthcoming bond, nor is that bond so much as mentioned therein.

In the next place, there is no such bond, nor the record of any Mississippi suit in evidence, and the witness, *Blocker,* who testifies that there was such a suit and and such a bond, does not tell us the names of the negroes who were claimed by the present plaintiff in that suit. He says, " *Mr. Gleises* afterwards gave bond for four of the slaves. Five slaves had been seized, but only four were claimed by *Gleises. Moses* was left over there in Mississippi, and was not claimed by *Gleises.*"

This testimony was taken, like all the rest, in the two injunction suits, which were tried together. Now, in that against *McHatton,* it is alleged that two slaves named *Sam* and *Octave,* had been seized by defendant; and in that against *Romagosa,* it is alleged that defendant had caused to be seized four slaves, named *Webb, Charles, Silas* and *Alfred;* all of whom, being six in number, are claimed by plaintiff, by virtue of the conveyance from *Ducayet,* of the 17th October, 1857. There is nothing in the record to show, which of these negroes named, are the negroes bonded by *Gleises* in Mississippi. It is, therefore, needless to enquire what kind of title or right to the negroes, the Mississippi forthcoming bond may have vested in plaintiff, inasmuch as there is neither allegation nor proof, to support any claim upon that ground.

The judgment of the District Court is therefore affirmed, with costs.

LAND, J., dissenting. The defendants, judgment creditors of *Felix Ducayet,* having caused certain slaves to be seized as his property, under executions issued on their judgments, the plaintiff enjoined the sales on the ground that he was the legal owner and in possession at the time of the seizure.

The answers of defendants deny the ownership of plaintiff, and aver that his title is a simulation, accepted by him for the purpose of defeating the just pursuits of the creditors of *Ducayet,* and that his possession was for the same purpose, and commenced only on the day preceding the seizure under the executions.

The questions presented by the pleadings, and the one decided by the court below, is whether the *title,* under which plaintiff claims the slaves, *is a simulation.*

The facts on which the District Judge rendered judgment in favor of defendants, are thus stated by him :

" Plaintiff claims certain slaves seized by the Sheriff of the parish under executions issuing in favor of defendants against *F. Ducayet,* which were about being sold to satisfy said executions when plaintiff enjoined the sale. The plaintiff claims under an act of sale from *Ducayet and wife,* of the date of 17th October, 1857, and the consideration of the sale is stated in said act to be $18,500. Defendants aver this act of sale is simulated. The evidence shows that *Ducayet* being largely in debt to *Bonneval, Schreiber & Co.,* mortgaged to them certain property situated on the Bayou St John, and seven slaves, (part of whom are the subject-matter of this suit,) and executed a deed of trust on certain property in Jackson County, Miss., to secure the said indebtedness. By an agreement between plaintiff and *Bonneval,* plaintiff assumed *Bonneval's* position towards *Ducayet. Bonneval* transferring to plaintiff all his securities, and plaintiff executing his obligations in favor of *Bonneval* for the amount of *Ducayet's* debts to *Bonneval,* so that *Ducayet* became the debtor of plaintiff to this amount. Plaintiff had also endorsed notes for *Ducayet* to the amount of $8000, and in order to secure plaintiff on account of these two indebtedness, *Ducayet* made the sale of the negroes seized and the Jackson County property. The witness, *Simms,* speaks of this sale as a security and not as a veritable sale."

In addition to these facts, it may be stated, that the property conveyed by *Ducayet* to the plaintiff consisted of two tracts or parcels of land situated in Jackson County, State of Mississippi, and seven slaves, also in said county and State, the place of domicil of *Ducayet*. That the slaves were left by plaintiff in the possession of *Ducayet*, and that four of them were attached by the creditors of the latter in the State of Mississippi, and that the plaintiff upon a claim of ownership, under his title from *Ducayet*, was permitted under the laws of that State to bond them. That he removed the slaves from the State of Mississippi to this city, where they were seized by the Sheriff, under the execution of *Romagosa*, as the property of *Ducayet*. And that the two slaves seized under the execution of *McHatton*, had been removed from the State of Mississippi only a few days before by *Ducayet*, but that they were, as the other four slaves, in the possession of the plaintiff at the time of the seizure..

The consideration of *the contract* between plaintiff and *Ducayet*, which they put *into the form of a contract of sale*, was, first, an *indebtedness* of *Ducayet* to *Gleises*, and secondly, the *liability of Gleises as the accommodation endorser* of *Ducayet*.

The District Judge came to the conclusion upon the evidence that there was a *real contract* between the parties,—but that as the real contract was one of mortgage or suretyship, that the apparent contract of sale was therefore *a simulation*.

To form a real contract of sale, it is not essential that the consideration should be paid in money,—the indebtment of the vendor to the vendee, will constitute, in the sale of a slave, a legal and sufficient consideration. *Weld* v. *Peters*, 1 An. p. 432. In that case, the consideration of the sale was very similar to the consideration shown by the evidence in this case. In the case cited, the vendee had possession of the slave from the date of the sale, and the court held that the conveyance to him could not be treated by a judgment creditor of the vendor as null, and that a direct action was necessary to avoid the contract.

In the case before the court, the possession of the plaintiff, under his act of sale, commenced only a day or two prior to the seizures of defendants, and then in consequence of the pursuit of *Ducayet's* creditors in the State of Mississippi.

The plaintiff, however, brings himself within the well settled rule which requires creditors to institute the revocatory action to set aside contracts having a real existence, but which have been made in fraud of their rights,—he has a title absolute on its face, translative of property, was in possession at the time of the seizure, and has shown that his title was based upon considerations which passed between *Ducayet* and himself.

Whilst the evidence shows that the conveyance to the plaintiff *was in fraud* of *Ducayet's* creditors, it also shows a *real contract between the parties in the form of a sale, and possession by the plaintiff*. Under these circumstances the law requires the creditors to resort to the revocatory action. *Kirkland* v. *New Orleans Gas Light Co.*, 1 An. 299. *Weld* v. *Peters*, ib. 432. 2 An. 913

It is, therefore, my opinion, that the judgment should be reversed.

MERRICK, C. J., concurred in this opinion.